UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARLINGTON HOSPITALITY, INC., *et al.*,

    Appellants/Cross-Appellees,

v.

ARLINGTON LF, LLC,
    Appellee/Cross-Appellant.

No. 08 C 5098
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

**I. Introduction**

    This case is on appeal to this Court for the second time. Arlington Hospitality ("Debtor") filed for bankruptcy and entered into a debtor-in-possession ("DIP") financing agreement with Arlington LF ("LF"). The Bankruptcy Court entered an Interim Order approving the DIP agreement. Under the Interim Order, Debtor was required to pay certain fees immediately, which it did not do. After approximately one month, LF refused to continue lending money to Debtor. After a trial, the Bankruptcy Court found that LF anticipatorily repudiated the agreement. LF appealed to this Court, which reversed and remanded, finding that Debtor repudiated the agreement shortly after the Interim Order was promulgated because Debtor neglected to pay the fees which were due. On remand, Debtor made several new arguments that LF in fact repudiated first. The Bankruptcy Court, considering itself bound by my prior ruling, found again for LF. The Bankruptcy Court also awarded LF a portion of certain fees and default interest for which LF had motioned. Debtor now appeals the Bankruptcy Court's ruling and LF cross-appeals the amount of the fee award. For the following reasons, I reverse the decision by the Bankruptcy

Court on remand and find that in light of Debtor's new arguments, LF did in fact anticipatorily breach the agreement, and therefore LF is not entitled to any fees or default interest.

## II. Standard of Review

I review the Bankruptcy Court's conclusions of law *de novo* and its factual findings for clear error. *In re UNR Industries, Inc.*, 986 F.2d 207, 208 (7th Cir. 1993).

## III. Statement of Relevant Facts

As this is the second time this case has reached my docket, I incorporate the following facts as stated in my first opinion:

> This case arises because Debtor—a developer and operator of roadside hotels—faced a set of dire financial circumstances. In response to its predicament, Debtor prepared to file a Chapter 11 bankruptcy petition. On a parallel track with its preparations to file for bankruptcy protection, Arlington also sought to find an entity that would provide debtor-in-possession ("DIP") financing.
>
> It was in this context that Arlington commenced discussions and negotiations with LF. Within just a few short days, the parties negotiated an agreement whereby LF would provide post-petition financing for Arlington. The parties memorialized this agreement in a document entitled "Outline of Terms and Conditions for Total DIP Financing Facility" ("Term Sheet"). The Term Sheet provided for a "Total DIP Facility" of $11 million. The DIP facility consisted of three components: a revolving loan not to exceed $6 million ("Revolver"); a $1 million term loan to be made available after December 31, 2005; and a $4 million term loan to fund the purchases of five executory contracts of unimproved real estate. On the same day the Term Sheet was executed, Arlington filed its Chapter 11 petition.
>
> Among the "first-day" motions Debtor filed was one pursuant to 11 U.S.C. § 364(c) and (d) seeking authorization to obtain post-petition financing. Attached to the motion were an executed copy of the Term Sheet; a draft "Interim Order Authorizing Incurrence of Indebtedness" ("Interim Order"); and a spreadsheet (connected to the Interim Order) called "the Budget." Despite objections from

some of Debtor's creditors, the bankruptcy court granted Arlington's motion and entered the Interim Order. The creditors' objections were based on the size of the fees, but in the Interim Order, the bankruptcy court found that:

> [t]he terms of the DIP Financing, taken as a whole, are more favorable to the Debtors than those available from alternative sources. The terms of the DIP Financing have been negotiated in good faith and at arm's length between the Debtors and Lender, are fair and reasonable under the circumstances and are enforceable according to their terms.

Interim Order, at 3.

The Term Sheet and the Interim Order were similar in several material respects, but were by no means identical. Much of the dispute below involved which of these documents governed; the Interim Order made clear that it was to control. It stated both that Debtor could borrow money "on the terms and conditions contained in this Order;" and that "[a]ll post-petition advances made by Lender to the Debtors shall be . . . made in accordance with the terms of this Order." Interim Order, at 4; *see also* Memorandum Opinion Below at 15-20 (holding that the Interim Order was the operative document).

The Interim Order explained the terms of the $6 million Revolver. It listed $6 million as the "Initial Loan Amount." It also laid out the regular and default interest rates and all of the fees mentioned in the Term Sheet, including "Commitment Fee: $100,000, payable immediately" and "Total DIP Facility Funding Fee: $210,000.00[,] payable immediately." Interim Order at 4-5. In addition, the Interim Order provided that Arlington would pay to LF "all of the Lender's fees, costs and expenses incurred in these cases, including all reasonable attorneys' fees and expenses, upon invoice." Interim Order at 6.

The Interim Order also granted super-priority status under 11 U.S.C. § 364(c)(1) to Arlington's "Post-Petition Obligations," i.e., the loan principal, the interest, and the fees. Interim Order at 1, 5. The Interim Order also provided for "Events of Default." One of them was "[t]he failure of the Debtors to make any payment described in paragraph 5 of this Order." Interim Order at 6. Like

the Term Sheet, the Interim Order granted LF a ten-day period
under which Arlington could only negotiate the terms of an asset
purchase agreement, or enter into such an agreement, with LF.

Interim Order at 8.

One of the significant differences between the Term Sheet
and the Interim Order is that the Term Sheet—unlike the Interim
Order—had a "Use of Proceeds" provision. According to the Term
Sheet, the financing could be used to "pay fees and expenses
associated with this transaction." The Interim Order contained no
such provision, and the Budget attached to the Interim Order
indicated that the 'DIP Fees" were to be paid with separate
funds—not drawn from the Revolver—that Arlington would have
to secure on its own.

On September 7, days after the Interim Order took effect,
Debtor began to utilize Revolver funds. LF wired $3,530,000 to
LaSalle Bank, paying off Arlington's pre-petition loan from
LaSalle in full. Despite the fact that the Interim Order called for
certain of the fees to be paid "immediately," Arlington did not pay
the various loan fees. Officials at Debtor testified that they
believed that those fees had been paid through a draw on the
Revolver.[1]

Within weeks of the entry of the Interim Order, things
began to sour. Individuals at LF began to worry about the decision
to enter into the deal. On September 29, Richard Marks (LF's
General Counsel) and Richard Morgner (Debtor's investment
banker) had a conversation in which Marks stated that LF was
unwilling to "fund any more money under the DIP."
Less than a week later, an attorney for the creditor's
committee was engaged in an e-mail exchange with another of
LF's attorneys. During the course of that conversation, LF's
attorney stated:

> We are not willing to proceed further with the DIP
> loan; in other words, we will make no further loans

---

[1]Arlington believed—based upon the Term Sheet—that the fees were going to be paid
through the Revolver. The Interim Order—again, purportedly the controlling document—did not
specify that the fees would be paid out of the Revolver and the Budget attached to the Interim
Order did not account for payment of the fees.

4

> to the Debtors. The lien granted to us by the interim
> orders [sic] secures the existing indebtedness. We
> think the Debtor should find a new DIP lender to pay
> out our loan and fund the options that expire at the
> end of this month.
>
> It was not until after these discussions (one on the phone and the
> other via e-mail) that LF sent an invoice to Arlington. Debtor did
> not pay the invoice. On October 20, LF faxed Debtor a letter
> declaring a default. Then, at an October 25 hearing before the
> bankruptcy court, both Debtor and LF agreed that no final order
> authorizing post-petition financing should be entered.
>
> In December 2005, the court entered an order approving the sale of
> Debtor's assets to Sunburst Hospitality. The month after the
> closing, Arlington repaid LF the more than $3.5 million that
> constituted the principal balance borrowed under the Interim Order.
> Arlington also paid non-default interest. However, Debtor refused
> (and continues to refuse) to pay LF default interest or any of the
> fees associated with the loan.
>
> Faced with Debtor's refusal to pay these sums, LF brought a
> motion for payment of these sums as administrative expenses.
> After a trial in front of the bankruptcy court, the bankruptcy judge
> issued a Memorandum Opinion and Order denying LF's motion.
>
> The court first held that it was the Interim Order—and not the
> Term Sheet—that constituted the parties' agreement.[2] It then went
> on to hold that Richard Marks' September 29 conversation with
> Richard Morgner and LF's counsel's October 4 e-mail constituted
> an anticipatory breach of the agreement. The court determined that
> as a result of the anticipatory repudiation, LF was not entitled to
> recover the fees or expenses it was seeking. This appeal followed.

*Arlington, LF, LLC v. Arlington Hospitality, Inc.*, No. 07 C 3632, 2007 WL 3334499, at *1-3

(N.D. Ill. Nov. 9, 2007).

In my first opinion, I found that the Interim Order language used to describe the payment

---

[2] Neither side attacks this point (that the Interim Order controls) on appeal, thus, I do not take up that determination here. For the purposes of this opinion, I assume that it was the Interim Order that governed the parties' relationship vis-a-vis the Revolver.

5

schedules for the different fees was inconsistent. One section of the Interim Order, specifically paragraph eight, required LF to send Debtor an invoice for fees, costs, and expenses that were due. On the other hand, in a separate paragraph (¶5(d) and(e)), Debtor was required to pay the Commitment Fee and DIP Facility Funding Fee "immediately." Since the language surrounding these payments was different, and since each paragraph referred to distinct fees, I found that the paragraphs must be construed differently. Ultimately, I concluded that the Commitment Fee and the DIP Facility Funding Fee were payable immediately. Further, since Debtor paid neither the Commitment Fee nor DIP Facility Funding Fee, Debtor was in default with respect to those obligations as of September 29, 2005, the date that Debtor claimed that LF anticipatorily repudiated the agreement. Since I found Debtor already in default, Debtor could not claim that LF repudiated the agreement on September 29, 2005. I remanded the case to the Bankruptcy Court for further proceedings consistent with those findings.

On remand, the Bankruptcy Court found for LF again, but only because it believed that my ruling required it to do so. The Bankruptcy Court heard defenses from Debtor about why it never paid the fees. These arguments had not been previously raised. Debtor and its Committee of unsecured creditors raised four arguments, each of which were ultimately rejected by the Bankruptcy Court. First, they argued that the Interim Order must be amended to lower the amount of administrative fees and expenses due to LF. The Bankruptcy Court found that Debtor was estopped from arguing against the Interim Order because it had been a proponent of it initially. The Committee was barred from arguing against the Interim Order because the law of the case doctrine allows a creditor to rely on a financing order if that creditor has already extended credit. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355

(7th Cir. 1990). A bankruptcy court can only undo the order if the lender acted in bad faith. *Id.* Since neither Debtor nor the Committee ever alleged bad faith, the Bankruptcy Court concluded that it was prevented from altering the Interim Order. Transcript of Bankruptcy Court Oral Ruling on Remand ("Transcript"), July 24, 2008 at 20.

Second, Debtor and the Committee argued that any breach which may have occurred was waived because LF continued to fund the loan and did not act as if there had been a breach. The Bankruptcy Court found this argument to be persuasive based on the evidence. Transcript at 24. However, the Interim Order contained two anti-waiver clauses and Debtor did not present distinct evidence to show any waiver of these anti-waiver clauses. Therefore, the Bankruptcy Court found that the Interim Order barred the argument made by Debtor and the Committee that LF waived Debtor's breach.

The third argument presented to the Bankruptcy Court focused on the requirement in the Interim Order that LF was to give Debtor three business days notice and an opportunity to cure any default (discussed in detail *infra* IV.A.1). The Bankruptcy Court found this argument persuasive, and Judge Goldgar indicated that he would have held for Debtor and the Committee on this basis but for the law of the case doctrine and my previous ruling finding that Debtor anticipatorily breached.

The final argument made to the Bankruptcy Court on remand was pursuant to the obscure "mend the hold" doctrine, which prevents a party from asserting different defenses in a contract dispute. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990). Debtor contended that LF could not base its refusal to lend on Debtor's failure to pay those fees which were "payable immediately" because LF never advanced that basis before. The Bankruptcy

7

Court again agreed with Debtors and the Committee that LF was attempting to change its defense in light of my first holding. However, the Bankruptcy Court again considered itself bound by the law of the case and found for LF. Transcript at 33.

Debtor now appeals the Bankruptcy Court's ruling on remand. Debtor argues that the law of the case does not bar it from arguing new defenses, and even if it were to present such a bar, my previous holding was narrow enough to allow the Bankruptcy Court to consider those defenses on remand. Debtor argues that my previous holding did not require the Bankruptcy Court to find for LF, so long as the Bankruptcy Court left in tact my conclusion that the Commitment Fee and the DIP Fee were payable immediately. For its part, LF opposes all of Debtor's arguments and cross-appeals the amount of administrative fees the Bankruptcy Court awarded it. Debtor's unsecured creditor's Committee have also filed an appeal, objecting to the amount of fees that LF was awarded and arguing that the Interim Order was not final (and therefore can now be amended to lower or eliminate those fees).

For the following reasons, I agree with Debtor and reverse the Bankruptcy Court. As such, I decline to address the Committee's arguments and LF's cross-appeal, which are rendered moot by my opinion here.

## IV. Discussion

### A. "Law of the Case" Doctrine

It is first imperative that I clarify my previous holding. My first holding in this case was narrow: I vacated the Bankruptcy Court's interpretation of its own Interim Order. I found that the two different paragraphs regarding the payment of certain fees in the Interim Order required two different interpretations, and as such, the Debtors were in default as of September 29, 2005.

When I said that Debtors cannot "simply claim that Lender anticipatorily breached," I meant that LF could not have repudiated after September 29, 2005 because Debtor was already in breach at that time. My remand for "proceedings consistent with this opinion" did not require the Bankruptcy Court to find for LF under all circumstances. Rather, it only required the Bankruptcy Court to uphold the finding that some fees required an invoice, while other fees were payable immediately. In reaching this first holding, I was not presented with and did not consider any of the issues brought up in this second appeal, namely (1) the "mend the hold" argument or (2) the notice requirement defense that Debtor claims the Interim Order mandates.

"The law of the case doctrine typically provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))**.** Additionally, on remand, a trial court must follow the express or implied rulings of the appellate court. *Moore v. Anderson*, 222 F.3d 280, 283 (7th Cir. 2000). However, a trial court does have discretion over matters which the appellate court did not address. *Id.* Thus, combining these two rules, on remand a trial court is bound by an appellate court's express or implied rules of law for subsequent stages of the case, but is free to decide new issues, so long as those decisions are consistent with prior rulings.

As applied to the case at bar, my first opinion did not decide or discuss any of Debtor's defenses to the breach, such as the "mend the hold" defense, LF's waiver, or the applicability notice requirement. Since my first holding was narrow in scope, and only re-interpreted the Bankruptcy Court's interpretation of the Interim Order, the Bankruptcy Court was able to consider these defenses on remand. Thus, the arguments were not barred by the law of the case.

9

I will discuss the notice requirement first.

### 1. The Notice Requirement

In paragraph 13, the Interim Order required that LF give Debtor notice of default and three business days of opportunity to cure the default before LF walked away from the deal. This notice and cure provision created a condition precedent which must have occurred before LF stopped dealing with the Debtors. Thus, under paragraph 13, a breach by Debtor would not be effective until after LF provided Debtor with notice and an opportunity to cure.

This argument was raised for the first time in the Bankruptcy Court on remand. The argument was advanced by Debtor in reaction to my first holding, and as such, is procedurally proper. Neither party could have predicted that I would find Debtor in breach as of September 2, 2005 (or at least LF had not petitioned for such reasoning), and therefore Debtor did not argue for protection under the notice provision. In other words, there was initially no reason for Debtor to raise the notice argument, and I certainly never considered that argument in the context of this case.

The Bankruptcy Court correctly reasoned that paragraph 13 of the Interim Order created a mandatory condition precedent to enforcement and that noncompliance with that requirement prevented LF from enforcing the contract. Transcript at 27. Further, the Bankruptcy Court considered and rejected the rule in Illinois contract law that allows a party to "walk away from the contract" when the other party breaches. *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 599 (7th Cir. 1986). Under the contract here (the Interim Order), LF was prevented from "walking away" until it satisfied two conditions: (1) give Debtor notice of any default and (2) give Debtor three business days opportunity to cure the default.

LF arguably gave Debtor notice of default, in the form of a letter faxed to Debtor's counsel on October 20, 2005.[3] Assuming this letter constituted sufficient notice of default, Debtor would have had until October 25, 2005[4] to cure the default. However, LF told Debtors on September 29 that it would not continue funding the Revolver. Since LF "walked away" prior to Debtor's breach becoming effective, LF did, in fact, repudiate the agreement.

The Bankruptcy Court correctly came to this conclusion but found itself restrained from finding for Debtor due to the scope of my first holding. As previously stated, my first holding was narrow and only interpreted payment of fees under the Interim Order. So long as the Bankruptcy Court left that conclusion intact, it could consider and decide other issues raised by the parties on remand. Furthermore, I arrived at my previous holding by assessing the record before me at that time. Using that record, I concluded that there was a breach in early September. The notice argument raised by Debtor has merit and opens the door to a different conclusion based on the same previous interpretation of the Interim Order. To borrow language from the Bankruptcy Court, the notice requirement allows Debtor to "revive [the] anticipatory repudiation argument." Transcript at 33. Since the notice argument does not contradict my original holding, and since I neither considered nor addressed it previously, the law of the case doctrine does not preclude it from being raised, and the Bankruptcy Court was within its power to find for Debtor.

---

[3] It is only arguable that the letter on October 20, 2005 provided notice because the letter was not technically notice of a default, but rather was an invoice for the Commitment Fee and the DIP Funding Fee.

[4] October 20, 2005 was a Thursday. Under paragraph 13, the Debtors would have three business days to cure, thus making October 25, 2005 the final opportunity to cure.

## 2. "Mend the Hold" Doctrine and LF's Waiver of Any Breach

The "mend the hold" doctrine limits the defenses a party to a contract can assert after the party has already given specific grounds for not performing. *Harbor Ins. Co.*, 922 F.2d at 362. Debtor argues that LF is now attempting to "mend its hold" in light of my prior ruling. Specifically, Debtor asserts that prior to remand at the Bankruptcy Court, LF never argued that Debtor was in breach as of September, 2005. But, in light of my first holding, LF now argues that position. Debtor argues that LF is attempting to change its position, or "mend its hold" to argue that Debtor anticipatorily breached.

Additionally, Debtor argues that LF waived any breach that may have occurred by continuing to perform. Despite the fact that the Interim Order contained two anti-waiver provisions, Debtor asserts that LF waived these anti-waiver provisions by their conduct. Debtor contends that the Bankruptcy Court incorrectly required different evidence to show waiver of the contract and waiver of the anti-waiver provisions.

I do not need to reach either of these questions at this time. Having already found that the notice and cure provision put LF in the position of anticipatorily repudiating the agreement, I do not need to answer whether LF is "mending the hold" or whether the Bankruptcy Court correctly required distinct evidence for the waiver argument. These arguments are now moot.

### B. The Committee's Argument

The third party in this case is Debtor's committee of unsecured creditors. The Committee has steadfastly objected to several terms of the Interim Order concerning the amount of administrative fees to which LF was entitled. The Bankruptcy Court continually denied the objections because Debtor assured the court that it was satisfied with the terms of the Interim

Order. The Interim Order was subsequently enforced and guided the parties' actions. When it was clear that LF was reneging on its agreement to finance the Revolver loan, Debtor withdrew its motion for a financing motion. Therefore, LF motioned to the Bankruptcy Court for payment of certain administrative expenses, including attorney's fees and default interest on the loan, which were allowed under the Interim Order. Debtor objected to this motion on the ground that LF anticipatorily breached and therefore was not entitled to the payment. The Committee also objected but on the grounds that the Interim Order was entered without notice to the Committee, or in the alternative that the Interim Order did not have the finality of a true financing order under Bankruptcy Rule 4001 and therefore could be modified. The Bankruptcy Court denied the Debtor's and the Committee's objections and granted LF's motion for administrative expenses. When this case was remanded, LF amended its motion for administrative expenses, and motioned for additional amounts to update the total amount they were due. The Bankruptcy Court granted the motion in part.[5] The Committee now renews its objections to the Interim Order, therein disputing that LF is entitled to these expenses.

The Committee and LF briefed these issues extensively. However, in light of my current holding in this second appeal, it is not necessary that I reach the issue of whether the Interim Order can be modified. The issue is moot. LF anticipatorily repudiated the agreement; accordingly, LF is not entitled to attorney's fees and default interest.

**C. LF's Cross-Appeal**

As mentioned above, LF motioned to the Bankruptcy Court on remand for a higher

---

[5] LF cross-appealed for the full amount of fees in its motion. The cross-appeal is discussed in more detail, *infra* IV.C.

amount of administrative expenses. LF motioned for approximately $1.7 million in attorneys' fees, default interest, and other expenses. The Bankruptcy Court granted LF $882,240.67. LF now cross-appeals, petitioning for the full $1.7 million and claiming that the Bankruptcy Court's accounting was incorrect.

However, LF's cross-appeal is moot for the same reason that the Committee's argument is moot. I need not delve into the accounting techniques of the Bankruptcy Court; LF is not entitled to fees in any amount because I have concluded that LF breached the contract first.

## V. Conclusion

For the foregoing reasons, I reverse the ruling of the Bankruptcy Court and remand to enter a judgment in favor of Debtor, Arlington Hospitality.

**ENTER:**

_____
James B. Zagel
United States District Judge

DATE: September 18, 2009